**ALLSTATE INSURANCE COMPANY and Salli Welker, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

No. 3:94–0932.

United States District Court,
M.D. Tennessee,
Nashville Division.

May 7, 1997.

Roger Alan Maness, Marks, Shell, Maness & Marks, Clarksville, TN, for Plaintiffs.

William Mark Cohen, Office of U.S. Atty., Nashville, TN, for Defendant.

## MEMORANDUM

ECHOLS, District Judge.

Plaintiffs, Allstate Insurance Company ("Allstate") and Salli Welker, brought this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, et seq., alleging that Defendant's employee, United States postal worker Grover Plymale, negligently caused an accident between Plaintiff Welker's automobile and Plymale's postal truck. Plaintiffs sue to recover damages for the cost of repairing Plaintiff Welker's car.

**Findings of Fact**

Plaintiffs brought this suit, contending that Mr. Plymale, while acting within the scope of his employment, negligently caused an automobile accident between his postal truck and Plaintiff Welker's car, which at the time was being driven by Ms. Welker's son, Frank Bradford ("Brad") Welker. Defendant maintains that the accident was wholly caused by Brad Welker's negligent driving, and that Mr. Plymale was not at fault. Defendant therefore contends that, under Tennessee's comparative negligence system, *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn.1992), Plaintiffs are not entitled to recovery.

The accident in question occurred on May 5, 1992, at the intersection of Hawkins Road and Morgan Road in Clarksville, Tennessee. The only vehicles involved were Mr. Plymale's postal truck and Ms. Welker's Chevrolet Camaro. Brad Welker was driving the Camaro at the time of the crash, with his girlfriend, Ashley Hanson, in the front passenger seat. Mr. Welker testified that, at the time of the crash, he was employed at Clarksville Memorial Hospital. He resided with his parents approximately one block from the accident site. Once or twice a week, Mr. Welker would drive home during his lunch break to eat lunch with his parents. The drive took approximately ten minutes. At trial, Mr. Welker testified that he was allowed one hour for lunch; upon cross-examination, however, he admitted that he had testified by deposition that he was permitted only a 45–minute break. He explained at trial that he could take hour-long breaks if he "clocked out" before leaving the hospital.

On the day in question, Mr. Welker left work at about 11 a.m. to pick up Ms. Hanson to go with him to his parents' home to eat. Mr. Welker picked up Ms. Hanson at her residence, then proceeded south on Hawkins Road. He stated that he was driving at about 35–40 miles per hour, although he admitted that he knew at the time that the posted speed limit on Hawkins was 30 miles per hour. He testified that at the time he was driving on Hawkins it had just started raining, making the road wet. Ms. Hanson testified that to the best of her recollection the weather was "sunny and warm." She corroborated Mr. Welker's testimony that he was driving between 35 and 40 miles per hour.

The testimony indicated that, while Mr. Welker was en route to his parents' home, Mr. Plymale, a federal postal worker, was in the midst of his mail delivery route. Mr. Plymale testified that he drove a half-ton Long–Life Vehicle ("LLV"), which was constructed with the driver's seat on the right side to facilitate mail delivery along the street. He testified that he had driven the same route nearly every day for many years. His route called for him, in part, to deliver mail on a portion of Hawkins heading north, make a left turn onto Morgan, travel a very short distance down Morgan, then make a U-turn. After making the U-turn, Mr. Plymale would make a right-hand turn onto Hawkins, heading south. Mr. Plymale testified that at the time of the accident it was raining, and that the roads were probably a bit slick. He stated that he was facing north on Hawkins, and was in the process of turning left onto Morgan to make the wide U-turn. He testified that he was wearing his seat belt, and that his left-turn signal was on. He checked north and south on Hawkins, and also checked Morgan for oncoming traffic. Seeing no cars approaching from any direction, he began the left-hand turn onto Morgan Road. Mr. Plymale testified that he did not

remember anything from that time until he awoke in the ambulance.

The evidence showed that, approximately 376 feet north of the intersection of Hawkins and Morgan, Hawkins bends to the east, cutting off the view of oncoming traffic from either direction. The point at which the road bends sits at the crest of a long hill which starts south of the Hawkins–Morgan intersection. The hill tapers off somewhat at the point the roads intersect, then runs more steeply uphill to the north of the intersection. Thus, at the time of the accident, Mr. Welker was heading downhill on Hawkins, while Mr. Plymale was turning in an uphill direction.

On direct examination, Mr. Welker testified that he saw the LLV immediately after he rounded the bend on Hawkins. On cross-examination, however, he changed his testimony, indicating that he did not see the truck until he was much closer to the intersection. Additionally, Mr. Welker stated on direct examination that, at the time he rounded the curve, he saw that the truck had already begun its left-hand turn onto Morgan from Hawkins. When the Court asked him to clarify his answer, Mr. Welker again testified that the truck was already in the process of commencing its turn when he first noticed it. On cross-examination, however, Mr. Welker stated that the LLV did not begin its turn until 30–45 seconds after he first saw it. Upon further questioning, Mr. Welker testified that he was approximately 200–300 feet from the truck when it started turning.

Ms. Hanson's version of the movements of the LLV is entirely different from Mr. Welker's. She testified that, at the time she first noticed the truck, it was in the northbound lane of Hawkins, but facing south. She stated that, as they approached, the truck began to make a U-turn in the middle of the road. Ms. Hanson also testified, however, that the Camaro was only about ten or fifteen feet from the truck when she first saw it. She then admitted that it could have been as long as ten seconds from the time she saw the truck until the collision occurred.

 The Court took judicial notice of the fact that there are 5,280 feet in one mile. Thus, at a speed of 35 miles per hour, it would take a car 7.52 seconds to travel the 376 feet from the point where Mr. Welker first saw the LLV to the Hawkins–Morgan intersection. At 40 miles per hour, it would take the car 6.58 seconds to travel that distance.

Mr. Welker testified that once he realized that he was about to hit the LLV, he slammed on the brakes. He stated that he did not apply the brakes until "real near the impact" of the two vehicles because he "had no idea [Mr. Plymale] was going to [turn]." Mr. Welker stated that his brakes locked, causing the Camaro to veer to the right. He later testified that he purposefully steered the car to the right in an attempt to circumvent the truck. He stated that he did not swerve to the left because he wanted to avoid a head-on collision with oncoming traffic in the northbound lane.

The evidence indicated that the front of the Camaro collided with the right front door of the LLV. The impact took place just after the LLV finished crossing the southbound lane of Hawkins onto Morgan. The force of the crash sent the LLV spinning across Hawkins. Mr. Plymale was thrown out of the LLV's right-hand driver's side door and onto the hood of the Camaro. He landed in the grass on the southwest corner of the intersection. The Camaro continued straight ahead after impact, finally colliding with a stop sign on the southwest corner of the intersection.

Mr. Plymale suffered serious injuries as a result of the accident, including a shattered shoulder bone. As of the date of trial, Mr. Plymale had been unable to return to service as a mail carrier. In addition, Ms. Hanson suffered a dislocated hip, and testified that she still has repercussions from that injury. Both Mr. Plymale and Ms. Hanson were taken from the scene of the crash by ambulance. However, Mr. Welker, in completing the "Acceptance of Financial Responsibility" section of a state-mandated accident report, answered "No" to the question of whether anyone was injured in the accident.

At trial, Mr. Welker testified that, upon realizing that the police would come to investigate the crash, he removed a cooler full of empty beer cans from the Camaro. He then

reconsidered this decision and placed the cooler back in the car. Upon cross-examination, however, it was revealed that, in his deposition, Mr. Welker first testified that he did not remove anything from his car, but later admitted to this act after a reminder by counsel. Mr. Welker also admitted at trial that the license plates affixed to the Camaro in actuality belonged to a truck owned by his parents.

Officer Andy Bechtold, a city police officer, was called to the scene of the accident. Officer Bechtold was assigned to the department's Fatal Accident Crash Team ("FACT" team) which investigates accidents involving fatalities or life-threatening injuries. He performed a preliminary investigation of the crash, but, upon realizing that no life-threatening injuries were involved, terminated his investigation. Officer Bechtold, along with another officer, marked with orange paint the skid marks leading to and from the site of impact. Officer Bechtold testified that his measurements of the skid marks were merely rough estimates, given that he had not completed his investigation. According to his notes, the longest skid mark, which was made by the left front tire of the car, was 85 feet, eight inches.

Mr. Robert DeLuca, a postal employee trained in accident investigation, also examined the crash site the day of the accident. Mr. DeLuca corroborated the testimony of everyone except Ms. Hanson that it was raining and that the roads were wet. He testified that, after the roads dried, allowing the tire rubber to come to the surface, he measured the skid marks left by the Camaro, then diagrammed the scene. Mr. DeLuca found that the skid marks of the car's back tires measured 36 feet from the brake point until the point of impact, and measured 54 feet from the point of impact until the stopping point. Mr. DeLuca also testified that he overheard Mr. Welker giving a statement to Officer Bechtold. Consistent with his testimony on direct examination, Mr. Welker told Officer Bechtold that he had observed the LLV immediately upon rounding the bend at Hawkins, and that the truck had already begun its left turn onto Morgan when he first saw it.

It was stipulated by the parties that the Camaro sustained $7,172.66 in damages as a result of the accident. Plaintiff Allstate was the collision and liability insurer for Plaintiff Welker's Camaro at the time of the crash, and, pursuant to the insurance policy, paid Plaintiff Welker for all but $500.00 of the damage to the car. Plaintiffs now sue to recover the total cost of repairing the car.

## Conclusions of Law

Plaintiffs allege that Mr. Plymale was negligent in attempting his left-hand turn from Hawkins onto Morgan, and that such negligence was the proximate cause of the accident. Under Tennessee law, a plaintiff alleging negligence must prove: (1) a duty of care was owed by the defendant to the plaintiff; (2) the defendant engaged in conduct falling below the applicable standard of care, amounting to a breach of the duty owed; (3) the plaintiff sustained an injury or loss; (4) causation in fact; and (5) proximate or legal cause. *Bradshaw v. Daniel,* 854 S.W.2d 865, 869 (Tenn.1993). However, under the comparative negligence doctrine, which was adopted by the Tennessee Supreme Court only one day before the accident in this case, a plaintiff is prevented from recovering if his own fault was equal to or greater than that of the defendant. *McIntyre v. Balentine,* 833 S.W.2d 52, 57 (Tenn. 1992) ("[S]o long as a plaintiff's negligence remains less than the defendant's negligence the plaintiff may recover").

In Tennessee, driving in excess of the speed limit constitutes negligence per se. *Johnson v. Attkisson,* 722 S.W.2d 390, 393 (Tenn.Ct.App.1986). Further, T.C.A. § 55–8–129 establishes drivers' duties of care in situations involving left-hand turns:

The driver of a vehicle within an intersection intending to turn to the left shall yield the right-of-way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard, but the driver, having so yielded and given a signal when and as required by this chapter, may take such left turn, and the drivers of all other vehicles approaching the intersection from the opposite direction

shall yield the right-of-way to the vehicle making the left turn.

■ After careful consideration of the testimonial and documentary evidence in this matter, the Court is convinced that Mr. Welker was more than 50% at fault for the accident, and thus that Plaintiffs are not entitled to recovery. First, Mr. Welker readily admitted that he was driving in excess of the speed limit, which constituted negligence per se on his part. Further, despite Ms. Hanson's contrary assertion, the testimonial and photographic evidence clearly showed that the weather was rainy and that the roads were wet, thereby rendering Mr. Welker's speed even more dangerous and his conduct more negligent. The Court finds that Mr. Welker's negligent speeding was an actual and proximate cause of the crash, in that, had he been traveling more slowly, he would have been able to stop in time to allow the LLV to complete its turn through the intersection.

In addition, although Mr. Welker changed his testimony regarding where he first noticed the LLV, and regarding the point at which he first observed the truck starting to turn onto Morgan, the evidence supports the initial story he related on direct examination: that he first saw the truck immediately upon rounding the curve on Hawkins, and that at that time the truck was already beginning its left-hand turn. This story is consistent with the statement Mr. DeLuca heard Mr. Welker give Officer Bechtold immediately following the accident. It is also consistent with Mr. Plymale's testimony that he never saw an approaching car. Based upon this evidence, at the time Mr. Welker rounded the bend and came into view, Mr. Plymale was already turning, and was therefore focusing his attention away from traffic on Hawkins. Ms. Hanson's version of the movements of the LLV was contrary to all of the testimonial and documentary evidence in the record, and thus is discounted by the Court.[1] In view of the testimony that Mr. Welker first saw the truck at a distance of approximately 376 feet, and at the time the truck was already begin-ning its turn, the Court finds that Mr. Welker had a duty to yield the right-of-way to Mr. Plymale in accordance with T.C.A. § 55–8–129.

Assuming Mr. Welker was roughly 376 feet from the intersection at the time he saw the truck beginning its turn, he had approximately six to seven seconds to slow down for the truck. The relatively short length of the skid marks from the brake point to the point of impact, along with Mr. Welker's admission that he did not apply the brakes until shortly before the crash, shows that Mr. Welker failed until the last moment to attempt to slow down to allow the LLV to complete its turn. Further, the Court is not persuaded that Mr. Welker's testimony that the LLV cut him off at the last moment is credible. Mr. Welker's testimony contained several inconsistencies which discredits his credibility. In addition, he lied on the accident report form, he lied in his deposition regarding removing the beer cooler from his car, and he had placed another car's license plates on the Camaro he was driving. The evidence also shows that Mr. Welker had only a short time to drive from the hospital to his home and back, and that he was driving at an excessive speed on a rain-slick residence street. Admittedly, he was some distance from the intersection when he first observed the LLV turning, but did not apply his brakes until it was too late to stop. The Court is convinced that Mr. Welker was negligent in failing to yield the right-of-way to Mr. Plymale, and his negligence was a proximate cause of the accident.

The Court further finds that Mr. Plymale also was somewhat negligent in attempting to execute the left-hand turn, but that any negligence on his part was far outweighed by that of Mr. Welker. Mr. Plymale signalled his intention to turn left, and looked in all directions for oncoming traffic before attempting the maneuver. However, as Mr. Plymale's route called for him to make a wide U-turn, rather than a simple left-turn, Mr. Plymale was forced to make the turn quite slowly; the evidence indicated that the

---

1. Ms. Hanson admitted on the stand that her memory of the events surrounding the crash was unclear.

truck was moving at 5–10 miles per hour through the intersection. Given the technique required to complete the maneuver Mr. Plymale was attempting, and that he knew the turn would take more time than would a simple left-turn, it was incumbent upon him to use extra care in executing the turn. Thus, Mr. Plymale was negligent in a much less degree in failing to take further precautionary steps before making the turn. However, considering the considerable evidence showing Mr. Welker's much greater negligence, the Court finds that the much lesser negligence by Mr. Plymale does not alter the ultimate liability of Mr. Welker in this case.

In sum, the Court finds that Mr. Welker was more than 50% at fault for the accident, and thus that under Tennessee law Plaintiffs may not recover for the damage to the Camaro. Accordingly, Plaintiffs' claim is hereby DENIED, and judgment is hereby entered in favor of Defendant.

An appropriate Order will be entered contemporaneously with this Memorandum.

### ORDER

This is an action brought by Plaintiffs, Allstate Insurance Company ("Allstate") and Salli Welker pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, et seq., alleging that Defendant's employee, United States postal worker Grover Plymale, negligently caused an accident between Plaintiff Welker's automobile and Plymale's postal truck. Plaintiffs sue to recover damages for the cost of repairing Plaintiff Welker's car.

For the reasons stated in the accompanying Memorandum, the Court finds that Plaintiffs have failed to meet their burden of proof on the claim that Defendant negligently caused the damage to Plaintiff Welker's automobile. Accordingly, judgment is hereby entered in favor of the Defendant and this case is DISMISSED.

The Memorandum entered contemporaneously herewith constitutes this Court's findings of fact and conclusions of law as re-

quired by Rule 52(a) of the Federal Rules of Civil Procedure.

It is so ORDERED.